OPINION
{¶ 1} Plaintiff-Appellant Stephen Germanoff, the administrator of the estate of Connie Sue Germanoff, appeals the decision of the Court of Common Pleas, Stark County, which entered judgment in favor of various defendants in a medical malpractice action. The relevant facts leading to this appeal are as follows.
 {¶ 2} On December 26, 1999, Connie Sue Germanoff, age 49, died from heart failure after reporting to the emergency room at Appellee Aultman Hospital ("Aultman") in Canton, Ohio. Between December 16, 1999 and the date of her death, Connie went to Aultman on four occasions and was seen by several different physicians. On December 16, 1999, Connie presented to Aultman with chest pain radiating into her left arm. Serial enzyme blood tests were ordered, including readings for "cardiac markers" myoglobin, troponin, and creatine phosphokinase (CPK). Peter Y. Lee, M.D., a cardiologist, was consulted on the morning of December 17, 1999 to assess the nature of Connie's chest pain. Dr. Lee reviewed Connie's records, including results from a stress test conducted in September 1999, and performed a physical examination. He further ordered an adenosine cardiolyte stress test, which mimics the effect of physical activity without the patient having to undergo a treadmill exercise test. Dr. Lee left the hospital upon completion of his rounds on December 17, 1999, and commenced a vacation. He did not review Connie's aforementioned myoglobin and troponin results prior to departing. At the time, Aultman's "reference ranges" for troponin, an indicator of heart muscle damage, were as follows: .03 or less was normal, .04 to .15 was a "gray" or indeterminate zone, and .15 or higher was diagnostic of a heart attack. Connie's first troponin level was .03. On the morning of December 17th, it was .05. At 5:00 pm that afternoon, it was .08. Connie's myoglobin readings, which are recognized as less specific cardiac markers, also went up during this period from 130 to 145, both of which were in an elevated range. Dr. Lee, however, admittedly did not see said results and did not order a cardiac catheterization for Connie. On December 17, 1999, Connie was seen by Allen Kamen, M.D., a cardiologist and partner of Dr. Lee. Dr. Kamen found Connie's laboratory results to be nondiagnostic. Dr. Kamen also supervised the adenosine cardiolyte stress test previously ordered. The results of that test were normal. Dr. Kamen thereupon determined that Connie could be discharged from a cardiology standpoint. On December 18, 1999, Dr. Humble, one of Connie's family physicians, discharged Connie from Aultman with instructions to follow up with him in two to three weeks and to consult with a gastroenterologist.
 {¶ 3} Connie returned to Aultman on the evening of December 20, 1999, again experiencing chest pain radiating into her left arm. She was seen at that time by M.W. Hatcher, M.D., an emergency room physician and an employee of Appellee Canton Aultman Emergency Physicians, Inc. Dr. Hatcher ordered an EKG and one set of cardiac marker enzymes. The EKG was normal. Connie's troponin level registered in Aultman's indeterminate range (.04) and her CPK level was normal, while her myoglobin level was abnormal. Nonetheless, Dr. Hatcher marked the overall cardiac marker panel as normal. Dr. Hatcher also reviewed Connie's medical history and performed a physical exam. Connie's blood pressure was initially elevated, but subsequently returned to normal. Dr. Hatcher also ordered a chest x-ray, which was normal. Because Connie's chest pain had lasted for several hours during that evening, Dr. Hatcher felt that this symptom was more consistent with gastroesophageal reflux. He concluded that Connie should be discharged that night with directions to take Reglan for acid reflux in the esophagus.
 {¶ 4} On December 24, 1999, Connie and was taken by ambulance to Aultman. The paramedics ran a single-lead cardiac monitor strip en route to the hospital, which they attached to their report for the hospital.[1]
Connie's condition was first observed by a registered nurse, who noted that her vital signs were normal. Although the ambulance paramedic told Aultman that Connie reported chest pain, both the nurse and Ginger Hamrick, M.D., the e.r. physician, recalled that Connie was experiencing epigastric pain, i.e., in the area of the upper abdomen just below the sternum. Thereafter, Dr. Hamrick examined Connie and reviewed her history. Dr. Hamrick also attached a cardiac monitor lead which could send an alarm to the nursing station if necessary. The monitor readouts were normal during this event. No EKG was ordered on this occasion.[2]
In light of such factors and her review of the previous cardiologists' recommendations, Dr. Hamrick reached the conclusion that the likelihood of a cardiac event at that time was "very slim." Tr. at 1806. Dr. Hamrick thus discharged Connie with directions to follow up with her family physician.
 {¶ 5} On December 26, 1999, Connie contacted Dr. Humble's office, complaining of chest pains. At Dr. Humble suggestion, Connie went to Aultman's emergency room. She died during this visit. The corner's report listed as the cause of death acute myocardial failure, cardiac tamponade, ruptured myocardium, acute myocardial infarction, coronary artery disease, hypertension, and cigarette smoking. The report concluded that Connie's heart attack was 48 to 72 hours old, and noted, inter alia, a 70 percent narrowing of the right coronary artery.
 {¶ 6} On June 16, 2000, appellant filed suit in the Stark County Court of Common Pleas, naming as the defendants Appellee Aultman, Appellee Canton Aultman Emergency Physicians, Inc. ("Emergency Physicians, Inc."), G. Hamrick, M.D., M.W. Hatcher, M.D., Appellee Cardiology Associates of Canton, Inc. ("Cardiology Associates"), Peter Y. Lee, M.D., Commonwealth Comprehensive Care, and Stacey Hollaway, M.D. Prior to trial, the issue of the aforementioned troponin "reference ranges" came into play. On January 3, 2000, shortly after Connie's death, Aultman changed the hospital's reference range to increased levels. Thus, certain troponin levels which were abnormal under the older reference range would be classified as normal under the newer version. Appellant filed a motion in limine to preclude admission of Aultman's subsequent change in the reference range. The trial court overruled the motion in limine. In addition, appellant sought discovery concerning the change in the troponin reference range. However, in judgments rendered August 27, 2001 and September 11, 2001, the trial court ruled that appellant was barred from discovery on the subject based on statutory peer review privilege.
 {¶ 7} On August 23, 2001, the trial court granted Aultman's motion for summary judgment, finding, inter alia, no genuine issue of an employee relationship between the hospital and defendant physicians. A jury trial commenced on August 27, 2001 against Emergency Physicians, Inc. and Cardiology Associates. Again, the issue of Aultman's subsequent change in the troponin reference ranges was brought to the court's attention. The court ruled in response to a motion that it would permit evidence on the changed reference range, but the specific reasons for the change were determined to be privileged and inadmissible. The court also addressed the issue of admitting evidence of troponin reference ranges at the California hospital utilized by Dr. Kaiser, appellant's expert. A similar discussion took place concerning reference ranges at the hospital utilized by appellant's emergency room expert. Appellant objected to the admission of reference ranges at other hospitals.
 {¶ 8} The case was submitted to the jury at the close of arguments. The jury rendered a verdict in favor of Emergency Physicians, Inc. and Cardiology Associates.
 {¶ 9} Appellant timely appealed, and herein raises the following seven Assignments of Error:
 {¶ 10} "I. THE TRIAL COURT ERRED IN ALLOWING IRRELEVANT, MISLEADING AND CONFUSING EVIDENCE OF A SUBSEQUENT CHANGE IN THE TROPONIN REFERENCE RANGE AT AULTMAN HOSPITAL.
 {¶ 11} "II. THE TRIAL COURT ERRED IN BARRING DISCOVERY ON THE SUBSEQUENT CHANGE IN A REFERENCE RANGE AT AULTMAN HOSPITAL.
 {¶ 12} "III. THE TRIAL COURT ERRED IN ALLOWING IRRELEVANT, MISLEADING AND CONFUSING EVIDENCE OF TROPONIN REFERENCE RANGES OUTSIDE OF AULTMAN HOSPITAL.
 {¶ 13} "IV. THE TRIAL COURT ERRED IN DISREGARDING THE MANDATE OF EVID.R. 611(B) AND 616 BY PRECLUDING CROSS-EXAMINATION OF EMERGENCY ROOM PHYSICIAN, DR. HAMRICK [,] ON HER MISREADING OF AN EKG THAT SHOWED A HEART ATTACK.
 {¶ 14} "V. THE TRIAL COURT ERRED IN IMPROPERLY BARRING PLAINTIFF'S COUNSEL'S CROSS-EXAMINATION OF DEFENSE EXPERT, DR. GRINBLATT[,] TO IMPEACH TESTIMONY HE HAD GIVEN IN DIRECT EXAMINATION.
 {¶ 15} "VI. THE TRIAL COURT ERRED IN PRECLUDING REDIRECT EXAMINATION OF PLAINTIFF'S EXPERT, DR. KAISER [,] AS TO WHY HE NO LONGER HAD CRITICISMS OF THE NON-DEFENDANT FAMILY DOCTORS.
 {¶ 16} "VII. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF AULTMAN HOSPITAL WHEN ISSUES OF FACT EXISTED ON AULTMAN'S LIABILITY."
 {¶ 17} On cross-appeal, Emergency Physicians, Inc. raises the following single Assignment of Error:
 {¶ 18} "I. BECAUSE, CONSTRUING THE EVIDENCE IN FAVOR OF APPELLANT, THE CARDIAC CATHETERIZATION WOULD NOT HAVE BEEN PERFORMED ON MRS. GERMANOFF FOR SEVERAL DAYS AFTER HER 12-24 ER VISIT, AND, BECAUSE MRS. GERMANOFF DIED ON 12-26, REASONABLE MINDS COULD ONLY CONCLUDE THAT APPELLANT FAILED TO ESTABLISH PROXIMATE CAUSE, AND THE TRIAL COURT ERRED BY DENYING CANTON AULTMAN EMERGENCY PHYSICIANS' MOTIONS FOR A DIRECTED VERDICT REGARDING THE 12-24 VISIT."
 Direct Appeal I. {¶ 19} In his First Assignment of Error, appellant argues that the trial court erred in allowing evidence to be presented to the jury concerning Aultman's subsequent post-1999 changes to its reference ranges for troponin levels. We disagree.
 {¶ 20} We first address appellees' responsive contention that appellant has waived his right to appeal this issue by failing to object to the introduction of the disputed evidence at trial. "Failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion in limine."State v. Wilson (1982), 8 Ohio App.3d 216, 219-220, 456 N.E.2d 1287. 220. See, also, Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83,86, 482 N.E.2d 1248, f.n 5. However, appellant herein did not rely exclusively on his motion in limine; rather, numerous oral objections to testimony concerning reference range changes are found in the transcript. Thus, we find the doctrine of waiver inapplicable in this sense.
 {¶ 21} Nonetheless, our primary concern in addressing this issue is the fact that appellant first raised the "reference range" change at trial in his own case in chief. Appellant called as his third witness, as if on cross-examination, cardiologist Dr. Lee. At page 720 of the transcript, prior to questioning by the other parties, appellant's counsel inquired of Dr. Lee whether the .08 troponin reading would still be abnormal "even after the change," referring to "the change in the reference range that occurred after she died." Clearly, appellant was seeking to show that at least one of Connie's troponin results were "abnormal" under either the pre- or post-January 2000 ranges. Appellant thus opened the door via the elicitation of the aforecited testimony, and cannot simultaneously utilize such evidence in his favor while claiming at other points to be prejudiced thereby. "A party cannot complain because the adverse party has been permitted to introduce immaterial or incompetent evidence if he has opened the door for it * * * by himself introducing similar evidence so that the evidence in question serves merely to explain or rebut that offered on his part." Pyles v. MidwestNeurosurgeons (Feb. 18, 1999), Allen App. No. 1-98-41, citing 5 Ohio Jurisprudence 3d (1978) 99-100, Section 544, and Krause v. Morgan
(1895), 53 Ohio St. 26. Such a result is consistent with the principle that a party is not entitled to take advantage of an error which he introduced or invited the trial court to make. See State v. Jones (March 15, 1995), Washington App. No. 94CA11, citing State v. Barnett (1990),67 Ohio App.3d 760, 769.
 {¶ 22} Appellant's First Assignment of Error is therefore overruled.
 II. {¶ 23} In his Second Assignment of Error, appellant argues the trial court erred in barring discovery pertaining to the Aultman reference ranges' alteration. We disagree.
 {¶ 24} R.C. 2305.251 reads as follows in pertinent part:
 {¶ 25} "Proceedings and records of all review committees described in section 2305.25 of the Revised Code shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care professional, a hospital, a long-term care facility, a not-for-profit health care corporation that is a member of a hospital or long-term care facility or of which a hospital or long-term care facility is a member, or another health care institution arising out of matters that are the subject of evaluation and review by the committee. * * *."
 {¶ 26} We review a trial court's discovery rulings under an abuse of discretion standard. Tracy v. Merrell Dow Pharmaceuticals (1991),58 Ohio St.3d 147. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. State v.Adams (1980), 62 Ohio St.2d 151. Appellant first contends that Aultman merely made a "blanket assertion" that the peer review privilege applied, and that the trial court thereby failed to hold the hospital and the other defendants to a sufficient burden for utilizing the privilege. He cites in support Peyko v. Frederick (1986), 25 Ohio St.3d 164,495 N.E.2d 918, a case involving the issue of attorney-client privilege, for the proposition that Aultman should have been required to present more evidence that reference range changes were actually privileged as the subject of a peer review proceeding.
 {¶ 27} Prior to trial, appellant requested via discovery "any and all documentation demonstrating a change in the reference ranges of the laboratory regarding myoglobin and troponin." Aultman responded with a memorandum prepared by Dr. Ong ("Ong memo"), dated January 3, 2000, which established new troponin ranges at the hospital. The trial court, in ruling on Aultman's motion for a protective order concerning peer review materials, noted the narrowness of the discovery request and that appellant had not sought to compel production of documents. Based on such circumstances, the trial court concluded that it was not required to determine by in camera inspection which portions of the remaining reference range materials were privileged. The trial court also found no merit in appellant's contention that Aultman's release of the Ong memo acted as a waiver of the peer review privilege, finding illogical the notion that a hospital would have to risk discovery of confidential proceedings simply by implementing the recommended change. Judgment Entry, Aug. 27, 2001, at 2-4.
 {¶ 28} Having reviewed the trial court's reasoning behind the issuance of the protective order in the context of the entire record, we do not reach the conclusion that the trial court abused its discretion in so ruling.
 {¶ 29} Appellant's Second Assignment of Error is overruled.
 III. {¶ 30} In his Third Assignment of Error, appellant argues the trial court erred in permitting evidence of troponin reference ranges established at other hospitals. We disagree.
 {¶ 31} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180, 510 N.E.2d 343. As a general rule, all relevant evidence is admissible. Evid.R. 402. Our task is to look at the totality of the circumstances of a particular case, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing the disputed evidence. See State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027, unreported. Evid.R. 403(A) reads: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." As an appellate court, we will not interfere with a trial court's balancing of probativeness and prejudice "* * * unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby." State v. Slagle (1992),65 Ohio St.3d 597, 602, 605 N.E.2d 916.
 {¶ 32} Appellant called, as his plaintiff's expert witness, cardiologist Dr. Thomas Kaiser from the California Pacific Medical Center. Dr. Kaiser testified on direct examination that troponin reference ranges could vary from hospital to hospital due to varying equipment manufacturers, different chemical assays, or different types of tests. He stated that it would be "absolute apples and oranges" when asked about comparing another hospital's reference ranges with his own facility's ranges. Tr. at 969. Nonetheless, counsel for Cardiologist Associates was able to cross-examine Dr. Kaiser utilizing a lab slip copy showing troponin reference ranges used by California Pacific, which utilized a myocardial diagnostic "cutoff" of 1.5 nanograms per milliliter, in contrast to the aforementioned 0.0 to .15 scale used by Aultman in 1999. A conference was thereupon held at the bench, at which time Attorney Strong, counsel for Cardiologist Associates, stated: "I need to get into his credibility as to how he utilized his own troponin * * *." Tr. at 1044.
 {¶ 33} After further discussion, the conference at the bench concluded as follows:
 {¶ 34} "MR. STRONG: No, I want to know how uses his numbers. That's the point.
 {¶ 35} "MR. KAMPINSKI: That's not what you are asking.
 {¶ 36} "THE COURT: That's what you are going to clarify.
 {¶ 37} "MR. STRONG: You can redirect as to the point it is apples and oranges.
 {¶ 38} "THE COURT: I want it made clear when you are starting to question in this area that it isn't necessarily the same range." Tr. at 1046.
 {¶ 39} As per the judge's directive, counsel for Cardiologist Associates re-commenced his questioning by twice asking Dr. Kaiser whether different assays were in use at Aultman and California Pacific, which was answered both times in the affirmative. Tr. at 1047.
 {¶ 40} Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. An appellate court should be slow to disturb a trial court's determination on the scope of cross-examination unless the trial court has abused its discretion and the party demonstrates a material prejudice. Wolgamot v.Heit (May 14, 2002), Franklin App. No. 01AP-1089, 2002-Ohio-2332, citingReinoehl v. Trinity Universal Ins. Co. (1998), 130 Ohio App.3d 186, 194,719 N.E.2d 1000. We cannot conclude that no confusion was possible at all under the record before us, as it even appears that Dr. Kaiser himself misstated at one point that Aultman was using a 1.5 cutoff scale, rather than .15. Tr. at 1053. However, "[t]he standard of care for a physician or surgeon in the practice of a board certified medical or surgical specialty should be that of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field * * *." Bruniv. Tatsumi (Ohio 1976), 46 Ohio St.2d 127, 346 N.E.2d 673, paragraph two of the syllabus. The issue of the troponin values was just one part, albeit an important one, of the overall standard of care of the defendant cardiologists. In light of the nearly two weeks' worth of overall trial testimony recorded in eleven volumes of transcript, we are unpersuaded that the trial court's allowance of cross-examination of the plaintiff's expert witness, Dr. Kaiser, rose to the level of an abuse of discretion and resulted in material prejudice warranting reversal. For similar reasons, we find unpersuasive appellant's additional arguments pertaining to defense expert, Dr. Michael Grinblatt's, testimony concerning troponin reference ranges at his hospital. Slagle, supra.
 {¶ 41} Appellant's Third Assignment of Error is overruled.
 IV. {¶ 42} In his Fourth Assignment of Error, appellant contends the trial court erred in preventing certain cross-examination of one of the emergency room doctors. We disagree.
 {¶ 43} Pursuant to Evid.R. 616(A), "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." However, Evid.R. 403(B) grants a court discretion to limit questioning if the "probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." An appellate court may not reverse a trial court's decision with respect to the scope of cross-examination absent an abuse of discretion. Calderon v. Sharkey
(1982), 70 Ohio St.2d 218, 436 N.E.2d 1008. Specifically, cross-examination of a medical expert regarding the expert's bias and pecuniary interest is also subject to the sound discretion of the trial court. Id., syllabus. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 44} Appellant specifically contends that he was prevented from cross-examining Dr. Hamrick, one of the emergency room physicians, concerning a prior malpractice action in which she was alleged to have misread an EKG, misdiagnosing an infarction as an attack of bursitis. Appellant urges that this issue takes on increased significance due to the "missing" 12-24-99 EKG printout in the case sub judice. However, we disagree with appellant's framing of this issue. The trial court's ruling at issue took place early in the trial when appellant called Dr. Hamrick as his second witness, as if on cross examination. The trial judge clearly stated on the record, during a conference at the bench, that appellant was not foreclosed from raising the prior malpractice case at a later point in the trial upon the laying of the proper foundation. Tr. at 688-689. Appellant's counsel further stated to the judge "* * * if I understand, you are not necessarily precluding this from being revisited later depending on the foundation." The court then replied: "No I am not . . . listen, motions made during the course of the trial are always subject to review during the trial." Tr. at 693. Dr. Hamrick several days later took the stand as a defense witness; however, appellant's counsel chose not to pursue the issue further. Tr. at 1816-1842. We therefore find no merit in appellant's argument that he was barred from the opportunity to cross-examine Dr. Hamrick concerning her actions in a past case.
 {¶ 45} Appellant's Fourth Assignment of Error is overruled.
 V. {¶ 46} In his Fifth Assignment of Error, appellant argues that the trial court erred in barring certain cross-examination of Cardiology Associates' expert witness, Dr. Michael Grinblatt, to impeach testimony he gave earlier in direct examination. We disagree.
 {¶ 47} Appellant focuses on a question to Dr. Grinblatt concerning his partner, Dr. Arthur Van Dyke. After questioning on cross concerning the approach cardiologists usually take in regard to troponin testing, counsel for appellant asked the following: "Is it your testimony that Doctor Van Dyke would agree with you in terms of the reference range, that is, if there was one, two, or three troponins elevated in excess of the reference range that that would not reflect cardiac damage?" Cardiology Associates' counsel objected, and the trial court sustained the objection without comment. Tr. at 2041. Appellant thus argues that he was wrongfully precluded from impeaching Dr. Grinblatt with potentially contradictory testimony by his partner.
 {¶ 48} Evid.R. 616(C) states that extrinsic evidence of contradiction, if offered for the sole purpose of impeaching a witness's testimony, is inadmissible unless the evidence falls under certain exceptions. As there was no sidebar called on the record concerning the question at issue, the specific reasoning behind the sustaining of the objection is not readily evident. Nonetheless, in light of the extensive evidence presented by all parties in this case, we do not find an abuse of discretion on the limitation of cross-examination at issue.
 {¶ 49} Appellant's Fifth Assignment of Error is overruled.
 VI. {¶ 50} In his Sixth Assignment of Error, appellant argues he was precluded from redirect questioning of appellant's expert, Dr. Kaiser, on the issue of previous "criticisms" of Connie's non-defendant family physicians. We disagree.
 {¶ 51} Appellant's counsel's second question of Dr. Kaiser on redirect was "what was your criticism of [the family practice group] originally?" Tr. at 1069. Counsel for Emergency Physicians, Inc. objected, arguing during the sidebar conference that the term "criticism" was not utilized during cross-examination. Tr. at 1071. Appellant's counsel then changed his question to "[y]ou have no opinions at all about the family physicians, do you?" Tr. at 1072. The trial court then overruled opposing counsel's objection to that question. Dr. Kaiser answered in the affirmative, indicating that he did have an opinion. Tr. at 1073. However, despite the trial court's allowance to appellant's counsel that he could continue with that line of questioning, he immediately moved on to another topic. Id.
 {¶ 52} Based on our review of the aforesaid section of transcript, we find no merit in appellant's claim that he was improperly precluded from redirect examination in this regard.
 {¶ 53} Appellants Sixth Assignment of Error is overruled.
 VII. {¶ 54} In his Seventh Assignment of Error, appellant argues the trial court erred in granting summary judgment in favor of Aultman Hospital prior to trial. We disagree.
 {¶ 55} Appellant directs us to Clark v. Southview Hosp. Family Health Ctr. (1994), 68 Ohio St.3d 435, 628 N.E.2d 46, syllabus, wherein the Ohio Supreme Court held: "A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when: (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care." In the case sub judice, there is no dispute that Aultman is known as a provider of medical services. Appellant thus argues that summary judgment was improper, as allegedly there were genuine issues pertaining to Connie's knowledge of the independent contractor status of the emergency room doctors and cardiologists.
 {¶ 56} However, we find the rule of Clark logically inapplicable herein, as the jury found no underlying "negligence of independent medical practitioners" for which Aultman could be, in theory, vicariously liable. In addition, appellant's counsel instructed the trial court during the summary judgment hearing of August 23, 2001, "* * * we do not have [a] claim against the hospital for independent negligence." Tr. at 44. An appellate court is not required to render an advisory opinion on a moot question or abstract proposition or to rule on a question of law that cannot affect matters at issue in a case. State v. Bistricky
(1990), 66 Ohio App.3d 395, 397; see, also, Travis v. Pub. Util. Comm. ofOhio (1931), 123 Ohio St. 355, paragraph two of the syllabus. We thus find the arguments raised under this assignment of error require no further analysis. App.R. 12(A)(1)(c). Accord Cherovsky v. St. Luke'sHosp. of Cleveland (Dec. 14, 1995), Cuyahoga App. No. 68326.
 {¶ 57} Appellant's Seventh Assignment of Error is overruled as moot.
 Cross-Appeal I. {¶ 58} In the sole Assignment of Error on cross-appeal, Emergency Physicians, Inc. argues that the trial court erred by denying their motion for a directed verdict regarding Connie's December 24, 1999 visit to the Aultman emergency room.
 {¶ 59} Based on our holding in regard to the direct appeal in the case sub judice, we need not reach the merits of the cross-appeal. The Supreme Court of Ohio has ruled:
 {¶ 60} "Where the court of appeals determines that the trial court committed no error prejudicial to the appellant in any of the particulars assigned and argued in the brief thereof, App.R. 12(B) requires the appellate court to refrain from consideration of errors assigned and argued in the brief of appellee on cross-appeal which, given the disposition of the case by the appellate court, are not prejudicial to the appellee. The judgment or final order of the trial court should, under such circumstances, be affirmed as a matter of law by the court of appeals." Pang v. Minch (1990), 53 Ohio St.3d 186, 191, paragraph eight of the syllabus.
 {¶ 61} We find the Supreme Court's above holding applicable to the circumstances herein. Emergency Physicians, Inc.'s sole Assignment of Error on cross-appeal is therefore overruled on grounds of mootness.
 {¶ 62} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.
By: Wise, J., Gwin, P.J., and Reader, V.J., concur.
[1] The strip was apparently lost prior to the lawsuit.
[2] According to the record, the monitor recorded one electrical "lead," while an EKG records twelve leads.